<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

| | |
|---|---|
| **BERNARD CAMPBELL,** | |
| Plaintiff, | |
| v. | Case No. 15-cv-00706 (CRC) |
| **DISTRICT OF COLUMBIA, <u>et al.</u>,** | |
| Defendants. | |

<div align="center">

<u>**MEMORANDUM OPINION**</u>

</div>

After observing Plaintiff Bernard Campbell participate in what they suspected was a drug deal, two Washington D.C. Metropolitan Police Department ("MPD") officers followed him into a liquor store. When one of the officers stopped Campbell to question him further, Campbell broke from the officer's grasp and attempted to exit the store. Surveillance video captured the ensuing struggle, including the officer pulling Campbell to the ground by his scarf and arresting him. A subsequent search uncovered the narcotic suboxone hidden in the lining of Campbell's jacket. Campbell was charged with assaulting a police officer and unlawful possession of a controlled substance, but prosecutors ultimately decided not to pursue either charge. Alleging that the District of Columbia and the two officers violated his constitutional rights by unlawfully seizing, arresting, and prosecuting him, Campbell later filed suit under both 42 U.S.C § 1983 and District of Columbia common law. With discovery now complete, Defendants move for summary judgment on all remaining claims on the grounds that the officers were justified in stopping and arresting Campbell, and are protected from liability by qualified immunity. Having closely examined the surveillance video, and for the reasons explained below, the Court will award summary judgment to Defendants on all claims save one—the initial investigatory stop of Mr. Campbell inside the liquor store.

## I.     Background

### A.     The Incident

On the evening of March 5, 2014, veteran MPD Vice Unit officers Newton and Croson were patrolling New York Avenue N.W. in an unmarked car when they spotted Mr. Campbell facing another man at the corner of 1st Street N.W.  Pl.'s Opp'n Mem. Supp. Mot. Summ. J. ("Opp'n"), Ex. 3 ("Newton Dep.") at 13:17–21.  Officer Newton testified in his deposition that Campbell had his arm outstretched, "displaying something in his hand."  Id. at 14:11–12.  At no point during this interaction, which lasted under a minute, did either officer see the other man gesture at Campbell or hand him anything.  Id. at 15:1–7.  Nevertheless, believing that a narcotics transaction was taking place, the officers drove towards the pair, but did not activate any emergency equipment to indicate that they were police officers.  Id. at 17:2–20.  Campbell then began walking east towards the corner of North Capitol Street and New York Avenue, where the iconic Big Ben liquor store is located.  Id. at 18:10–12.  Officer Newton, wearing a black tactical vest with "POLICE" written prominently in white on the front and back, got out of the car and followed Campbell on foot.  Id. at 19:1–6.  Newton started out five to ten feet behind Campbell but closed the distance to within two to three feet by the time Campbell reached the entrance of Big Ben.  Id. at 22:18–22.  Campbell was walking quickly, but did not run or otherwise quicken his pace while he was being followed.  Id.  As soon as Officer Newton entered Big Ben, he says he observed Campbell make a tossing motion toward a trash can located in the corner of the store, but did not see what was in his hand.  Id. at 23:22–24:5.  Newton grabbed Campbell by his waist, at which point, Newton testified, Campbell punched him in the face before attempting to flee through the open door.  Id. at 28:14–21.

Mr. Campbell recounts things differently.  See Pl.'s Opp'n, Ex. 4 ("Campbell Dep.").  He testified in his deposition that he was on his way to Big Ben with a friend who had asked Campbell to buy alcohol for him.  Id. at 11:1–9.  His mother lived on 1st Street and Campbell was using a shortcut to reach New York Avenue.  Id. at 11:16–22.  Campbell denies ever stopping to show his friend anything and insists that he did not know he was being followed until he was inside the store and people "ran up behind [him] . . . [and] just started grabbing [him]."  Id. at 14:6–18.  Campbell purports not to have realized that his pursuers were police officers until well into the encounter because they did not announce themselves and "POLICE" was not clearly visible on the front of their vests.  Id. at 14:14–16.

Both parties have also submitted surveillance video footage (without audio) that captures what transpired inside Big Ben from multiple angles.  See Def.'s Mem. Supp. Mot. Summ. J. ("MSJ"), Ex. 4 (Video).  The video shows Campbell enter the store with Officer Newton close behind him.  Almost immediately upon entering, Officer Newton grabs Campbell's right arm and then takes his other arm while glancing behind his right shoulder at something located off screen. Campbell—who appears to be much larger than either officer—starts to jerk in the direction of the open door while using his hands to break Officer Newton's grasp.  Officer Croson at that point comes through the open doorway to assist and the two officers are able to corner Campbell. To Campbell's right is an icebox, which the officers attempt to have him bend over with his hands and face flat on its surface.  When Campbell hesitates, Officer Newton puts his hand around Campbell's neck to try to force his head down to the icebox.  Still unable to pull Campbell's head down, Officer Newton puts both of his hands around Campbell's neck to try again.  Campbell reacts by pushing Newton in the chest.  After stumbling back a few steps, Newton latches onto Campbell's scarf and uses it to pull Campbell down to the ground, where he

pins him to the floor while Officer Croson calls for back-up.  The two officers struggle to keep

Campbell on the floor, but within minutes multiple officers arrive to assist and secure the

suspect.  Campbell, propped up by multiple officers, is led off camera.  The video does not show

Campbell punching Officer Newton, nor does it show either officer striking Campbell during this

encounter.

Sergeant Martello, the commanding officer at the scene, authorized the officers to charge

Campbell with assault on a police officer, a misdemeanor offense under D.C. Code § 22-405.

The arrest report states that the officers discovered suboxone sublingual film strips (a Schedule

III narcotic)[1] in the lining of Campbell's jacket and recovered $300 from a trash can inside Big

Ben.  See Def.'s MSJ, Ex. 5 (Arrest Report).  Campbell complained of dizziness and chest pains

after the arrest.  He was taken to a nearby hospital, but was released several hours later after tests

came back negative.  See Pl.'s Opp'n, Ex. 7 (Medical Records).

B.      Procedural History

After his arrest on March 5, 2014, an Information charged Campbell with (1) Assaulting,

Resisting or Interfering with a Police Officer in violation of D.C. Code § 22–405(b); and (2)

Unlawful Possession of a Controlled Substance (Suboxone) in violation of D.C. Code § 48–

904.01(d).  On September 4, 2014, weeks before the case was set for trial, the Government filed

a Notice of Nolle Prosequi, indicating their intention not to pursue charges.  Def.'s MSJ, Ex. 6.

Campbell subsequently filed a complaint in the Superior Court for the District of Columbia

against Officers Newton, Croson, and the District of Columbia, raising § 1983 and common-law

tort claims.  Defendants removed the case and moved for a partial dismissal, which the Court

_____

[1] Suboxone is a treatment for opiod dependence but can be unlawfully abused.

granted, dismissing all § 1983 claims brought under the Fifth and Fourteenth Amendment and the § 1983 and punitive damage claims against the District of Columbia.  The parties proceeded to discovery, and Defendants now move for summary judgment on all remaining claims.  The Court held a hearing on the motion on March 1, 2017.  At the hearing, Campbell's counsel conceded that nothing found in discovery supported his negligent supervision and hiring claim. The Court therefore dismisses that claim and addresses the remaining claims below.

## II.    Legal Standards

### A.    Summary Judgment

The Court will grant summary judgment only if the movant shows that there is no genuine dispute as to any material fact.  Fed. R. Civ. P. 56(a).  A fact is material if it could affect the outcome of the litigation and a dispute is genuine if it could move a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must draw all reasonable inferences in favor of the non-movant.  Id. at 255.  The court's role at this stage does not include making credibility determinations or weighing the evidence; instead, it is limited to deciding if there is a genuine issue warranting a trial.  Id. at 249.

To prevail on a motion for summary judgment, therefore, the moving party must show that the evidence, even when viewed in favor of the non-movant, cannot support an essential element of the case.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  To defeat summary judgment, the non-moving party cannot simply rely on unsupported allegations or denials but must offer affidavits or other competent evidence to establish that material factual disputes exist. Id. at 324.  When video evidence is available and "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a

court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 378 (2007). Rather, "in a case where the court has the benefit of video evidence, the Supreme Court has stated that courts deciding summary judgment motions should view the facts in the light depicted by the videotape[.]" Armbruster v. Frost, 962 F. Supp. 2d 105, 110 (D.D.C. 2013) (quoting Scott, 550 U.S. at 380–81) (internal quotation marks omitted).

      B.    Qualified Immunity

A law enforcement official, acting "under color of [state or D.C. law], [who] subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. While § 1983 "permits a state actor to be held accountable in his individual capacity for conduct that violates constitutional rights," qualified immunity can limit individual liability if the official's actions are found to warrant it. Kyle v. Bedlion, 177 F. Supp. 3d 380, 387–88 (D.D.C. 2016). "Qualified immunity prevents officials who violate the law from having to defend against lawsuits for money damages unless the legal rules that were clearly established at the time the action was taken gave those officials fair warning that they were acting contrary to law." Id. (quoting Messerschmidt v. Millender, 565 U.S. 535, 546 (2012)) (internal quotation marks and citation omitted).

A defendant must first raise the defense of qualified immunity when facing a § 1983 claim, but once asserted, "the burden of proof . . . falls to the plaintiff to show that the official is not entitled to qualified immunity." Winder v. Erste, 905 F. Supp. 2d 19, 28 (D.D.C. 2012) (internal citation omitted). The Supreme Court has created a two-part inquiry for determining whether qualified immunity applies at the summary-judgment stage: (1) looking at the facts in

the light most favorable to the injured party, did the officer violate a federal right and (2) were the legal rules governing that right "clearly established" at the time of the officer's actions? Messerschmidt, 565 U.S. at 546.  The suit can only proceed if the plaintiff can show that the answer to both questions is yes.  Id.

A right is "clearly established" if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) (quoting Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)).  "'Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or [D.C.] Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'"  Doe v. D.C., 796 F.3d 96, 104 (D.C. Cir. 2015) (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  In other words, "existing precedent must have placed the statutory or constitutional question beyond debate."  Hargraves v. D.C., 134 F. Supp. 3d 68, 78–79 (D.D.C. 2015) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).

## III.   Discussion

Campbell's remaining claims for relief arise under § 1983 and several common-law torts. Under § 1983, he claims that the officers violated his constitutional rights by unlawfully seizing him, falsely arresting and imprisoning him without probable cause, and using excessive force against him when conducting the stop and arrest.  See Compl. Count I.  Campbell's tort claims include:  (1) assault; (2) battery; (3) false arrest, imprisonment, and prosecution; and (4) intentional infliction of emotional distress (IIED).  See id. Counts II–V.  The Court will address each claim below.

7

A.      § 1983 Claims:  Unlawful Seizure

In an encounter with law enforcement, potential constitutional violations are evaluated

independently for the purposes of § 1983.  See Muehler v. Mena, 544 U.S. 93, 102 (2005).

Therefore, an investigatory stop, arrest, or any associated search must meet the corresponding

Fourth Amendment standard applicable to that particular action.  Id.  Police officers conducting

an investigatory stop, such as here, must be operating on a reasonable and articulable suspicion

that the suspect is engaged in criminal activity, rather than an "inchoate and unparticularized

suspicion or hunch."  Terry v. Ohio, 392 U.S. 1, 27 (1968).  A full-blown arrest, by contrast,

must be supported by probable cause.  Martin v. Malhoyt, 830 F.2d 237, 262 (D.C. Cir. 1987).

Both inquiries are objective:  they ask whether a reasonably prudent officer would be warranted

in his belief based solely on the "facts available to [her] at the moment of the seizure."  Id.  In

§ 1983 cases, qualified immunity also protects an officer's *mistaken* (but reasonable) conclusion

regarding the law.  See Dormu v. D.C., 795 F. Supp. 2d 7, 19 (D.D.C. 2011) (quoting Wardlaw

v. Pickett, 1 F.3d 1297, 1304 (D.C. Cir. 1993)).

        *1. Investigatory Stop*

To determine whether reasonable suspicion exists to conduct an investigatory stop, courts

consider the totality of the circumstances, "understanding that factors individually susceptible to

an innocent explanation may suffice to form a particularized and objective basis when taken

together."  United States v. Castle, 825 F.3d 625, 634–35 (D.C. Cir. 2016) (quoting United States

v. Arvizu, 534 U.S. 266, 277 (2002)) (internal quotation marks omitted).  At the hearing, both

sides agreed that Officer Newton conducted an investigatory stop when he initially grabbed

Campbell's arm just inside Big Ben.  Defendants further contend that the stop was justified

because Officer Newton had a reasonable, articulable suspicion that Campbell had committed a

narcotics-related offense.  They point to the following facts to support the officer's suspicion: (1) the officers were in a high-crime area known for the sale and use of narcotics, (2) Officer Newton saw Campbell display something in his palm to another individual, (3) Campbell walked quickly away from the officers, and (4) Officer Newton observed Campbell make a "tossing motion" towards a trash can inside the liquor store.  See Def.'s MSJ 6.

Campbell, by contrast, denies ever displaying anything to his friend or tossing anything into the trash, and maintains that he did not realize that he was being followed by police until they confronted him inside Big Ben.  Because none of the circumstances discussed above occurred on camera, the Court must view the facts in the light most favorable to Campbell and draw every reasonable inference in his favor to determine if summary judgment is warranted in favor of Defendants.  See Flythe v. D.C., 791 F.3d 13, 19 (D.C. Cir. 2015).  Applying that standard here, the only undisputed facts bearing on the officers' suspicions are that the incident occurred in a purportedly high crime area and that Campbell walked quickly toward Big Ben liquor store soon after they observed him.  Compare Defs' SMF ¶ 1–10 with Pl.'s SMF ¶ 1–10.  And those factors alone do not give rise to reasonable suspicion.  See Brown v. Texas, 443 U.S. 47, 52 (1979) (no reasonable suspicion where suspect walked away from another individual in a neighborhood known for drug trafficking); Castle, 825 F.3d at 636 (no reasonable suspicion where defendant walked away from an unmarked police car in a "high-crime area particularly associated with PCP distribution"); U.S. v. Beauchamp, 659 F.3d 560, 570–71 (6th Cir. 2011) (no reasonable suspicion where suspect "hurriedly walk[ed] away from an officer" in a high-crime area); U.S. v. Sprinkle, 106 F.3d 613, 617–19 (4th Cir. 1997) (no reasonable suspicion where suspect with a criminal record was stopped in a high-crime area after huddling with an acquaintance in his car and driving away upon seeing the police pass by).  Therefore, "[a]t this

stage in the proceedings, during which the Court may not engage in credibility determinations or

weigh the evidence[,]" the Court concludes that material factual disputes exist regarding whether

the officers violated Campbell's constitutional rights by initially seizing him without reasonable

suspicion.  See Dormu, 795 F. Supp. 2d at 21.[2]

Even if the undisputed facts were to establish as a matter of law that the investigatory

stop violated the Fourth Amendment, Defendants would be entitled to summary judgment on

their qualified immunity defense if the violation Campbell complains of was not "clearly

established."  See id.  "In determining whether officers strayed beyond clearly established

bounds of lawfulness, [the Court] look[s] to cases from the Supreme Court and [the D.C.

Circuit], as well as to cases from other courts exhibiting a consensus view.  [It] need not identify

cases with 'materially similar' facts, but [has] only to show that 'the state of the law [at the time

of the incident] gave [the officer] fair warning that [his alleged misconduct] . . . was

unconstitutional.'"  Johnson v. D.C., 528 F.3d 969, 976 (D.C. Cir. 2008) (quoting Hope v.

Pelzer, 536 U.S. 730, 741 (2002)).  It is well-established that investigatory stops must be

---

[2] The Court further notes that even under Officer Newton's version of events, as presented in his deposition and in Defendants' summary-judgment briefing, his observations would likely *still* not give rise to reasonable, articulable suspicion.  In Duhart v. United States, 589 A.2d 895 (D.C. 1991), the D.C. Court of Appeals found unconstitutional an investigatory stop based on the following circumstances:  (1) the suspect and another individual were examining an "object" on the street, (2) they were in a high-crime area, (3) they walked away from police when approached, (4) the suspect shoved an item into his pocket when he saw the police and would not remove his hand from his pocket when asked.  See id. at 898–99.  The Duhart court found these circumstances lacking because the "suspicious" behavior could be explained by any number of "innocent explanations," and the fact that the incident occurred in a "high narcotics activity area [did] not objectively lend any sinister connotation to facts that are innocent on their face."  Id. at 899–900.  D.C. Court of Appeals decisions are "instructive, albeit not binding" on the Court's Fourth Amendment analysis.  Castle, 825 F.3d at 633; see also Kyle, 177 F. Supp. 3d at 397 (looking to D.C. Court of Appeals precedent for guidance on Fourth Amendment jurisprudence).

Case 1:15-cv-00706-CRC   Document 19   Filed 03/29/17   Page 11 of 17


supported by reasonable suspicion.  See Terry, 392 U.S. at 30.  And as noted previously, decades-old Supreme Court precedent instructs that observing a suspect walking away in an area known for drug trafficking is not enough to support a reasonable, particularized suspicion to justify a Terry stop.  See Brown, 443 U.S. at 52 (1979).  Lower courts agree.  See, e.g., Castle, 825 F.3d at 636; Beauchamp, 659 F.3d at 571; Sprinkle, 106 F.3d at 619; Duhart, 589 A.2d at 900.  Accordingly, under clearly established precedent, Defendants are not entitled to summary judgment on the basis of qualified immunity because, on the undisputed facts, the officers would have had "fair warning" that they were acting contrary to the law when they conducted the investigatory stop.

### 2. *The Arrest and Prosecution*

The Court's inquiry does not end with Campbell's initial seizure because the investigatory stop eventually morphed into an arrest requiring probable cause.  Defendants contend that Campbell's arrest was lawful because the officers had probable cause to arrest him for assault on a police officer ("APO").  See D.C. Code § 22-405(b).  Section 405(b) of the D.C. Code provides that "whoever without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates, or interferes with a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties shall be guilty of a misdemeanor[.]"  Id. § 22–405(b).[3]  The D.C. Court of Appeals has explained that, to "constitute 'resisting' a police officer, a person's conduct must go beyond speech and mere

---

[3] Section 22-405(d) further specifies that "[i]t is neither justifiable nor excusable cause for a person to use force to resist an arrest when such an arrest is made by an individual he or she has reason to believe is a law enforcement officer, *whether or not such arrest is lawful*."  D.C. Code § 22-405(d) (emphasis added).

passive resistance or avoidance, and cross the line into active confrontation, obstruction or other action directed against an officer's performance in the line of duty by actively interposing some obstacle that precluded the officer from questioning him or attempting to arrest him." Gayden v. United States, 107 A.3d 1101, 1104–05 (D.C. 2014).

The surveillance video plainly shows Campbell putting up such obstacles:  As previously discussed, Officer Newton was facing Campbell when he grabbed him by his right arm to hold him in place for an investigatory stop.  But Campbell immediately proceeded to jerk towards the open doorway while forcefully pushing Officer Newton's hands away.  After seeing what was happening from outside, Officer Croson entered the store to assist his partner and the two officers physically directed Campbell to lean onto the nearby icebox.  When Campbell demurred, Officer Newton attempted to push him onto the icebox, but Campbell continued resisting and used both of his hands to push Officer Newton away.  At this point, Officer Newton attempted to gain control of Campbell by grabbing his scarf and pulling him to the ground.  Campbell's actions throughout this encounter were clearly "active and confrontational,"—rather than "passive"—thus, creating the probable cause necessary to arrest him on an APO charge. Compare Hargraves, 134 F. Supp. 3d at 84 (finding that defendant's refusal to follow officer's instruction to get down on the ground and balling his hand into a fist was *active* resistance) with In re C.L.D., 739 A.2d at 357–58 (finding that a defendant's refusal to identify himself was *passive* resistance); Howard v. United States, 966 A.2d 854, 856 (D.C. 2009) (finding that defendant's defiance of an instruction to remove her hands from pockets was *passive* resistance).

Campbell argues that there was no probable cause for the APO arrest because he did not know that Newton and Croson were police officers. See Campbell Dep. at 14:14–17 ("On the front of them you can't really see nothing[.]").  The video record unmistakably contradicts his

account, however, because it shows both officers outfitted in black tactical vests with "POLICE" in bold, white letters on the front and back.  Cf. Smith v. United States, 121 F. Supp. 3d 112, 125–26 (D.D.C. 2015) (finding that "[t]he fact that [the officer] was in uniform was more than enough to establish the additional element of assault on a police officer"), aff'd, 843 F.3d 509 (D.C. Cir. 2016).  Campbell also contends that Officer Newton's unsubstantiated allegation that he was punched in the face prior to making the arrest precludes a finding of probable cause.  Campbell is correct that such a fact would normally bear on Officer Newton's credibility, perhaps creating a triable issue.  But while a punch would have indisputably strengthened the officers' basis for arresting Campbell, the video evidence alone is enough to show that probable cause supported the arrest based on his physical resistance.  Therefore, the Court concludes that Campbell cannot establish as a matter of law that Defendants falsely arrested him in violation of the Fourth Amendment.[4]

B.      § 1983: Excessive Force

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."  Graham v. Connor, 490 U.S. 386, 394 (1989).  When, as here, an individual claims to have been the victim of excessive force by law enforcement, Fourth Amendment analysis will govern his claim.  Id.  A violation of the Fourth Amendment, therefore, requires an individual to have been "seized," and for the force used in seizing the individual to have been "objectively

---

[4] Because probable cause supported Campbell's arrest, his § 1983 malicious prosecution claim also fails.  See Pitt v. D.C., 491 F.3d 494, 511 (D.C. Cir. 2007) ("We join the large majority of circuits in holding that malicious prosecution is actionable under 42 U.S.C. § 1983 to the extent that the defendant's actions cause the plaintiff to be unreasonably 'seized' without probable cause, in violation of the Fourth Amendment.").

unreasonable." Id. at 388.  In making this "reasonableness" determination, the D.C. Circuit has

set forth four factors for courts to consider:  (1) the facts and circumstances of the particular case,

(2) the severity of the crime, (3) whether the plaintiff posed an immediate threat to the safety of

the officers or other individuals, and (4) whether the plaintiff was actively resisting arrest or

attempting to flee.  See Wasserman v. Rodacker, 557 F.3d 635, 641 (D.C. Cir. 2009) (quoting

Graham, 490 U.S. at 396).  The assessment should be "objective," i.e., the subjective intent of

the arresting officer has no bearing on the outcome of the analysis.  See id. (citing Whren v.

United States, 517 U.S. 806, 812–13 (1996)).  A defendant's motion for summary judgment on

an excessive force claim "is to be granted unless 'the excessiveness of the force is so apparent

that *no reasonable officer* could have believed in the lawfulness of his actions.'"  Wasserman,

557 F.3d at 641 (D.C. Cir. 2009) (quoting Wardlaw, 1 F.3d at 1303) (emphasis added).

     Both parties agreed at the hearing that Campbell was "seized" when he was arrested

inside of Big Ben liquor store.  See Graham, 490 U.S. at 396.  The pertinent question, then, is

whether the officers' use of force in arresting Campbell was objectively unreasonable.  The

record indicates it was not.  Looking to the particular facts and circumstances of this case,

Campbell, at 6'6" and 230 pounds, towered over Officer Newton, who at 5'10", was unable to

control Campbell using ordinary tactics, such as holding him by the waist.  And as evidenced by

the video, Officer Newton escalated his use of force only after Campbell attempted to pull away

from him and flee.  Indeed, Officer Croson left a suspect outside and intervened because he

feared for the safety of his partner.  Def.'s MSJ, Ex. 3 ("Croson Dep.") at 21:9–21.  The tactical

maneuvers Officer Newton employed on Campbell—pushing him by the neck and yanking on

his scarf—might, in twenty-twenty hindsight, be more than were necessary to subdue Campbell,

but they did not fall outside of the realm of what a reasonable officer would do when faced with

14

a much larger, actively resisting suspect.  "The calculus of reasonableness must embody

allowance for the fact that police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

necessary in a particular situation."  Graham, 490 U.S. at 396–97; see also Hargraves, 134 F.

Supp. 3d at 87 ("The Fourth Amendment is not violated . . . by every push or shove, even if it

may later seem unnecessary in the peace of a judge's chambers.").  Furthermore, neither of the

officers struck Campbell and although he was taken to the hospital, he was released later that

night when tests failed to show any sign of significant injury.  Cf. Wasserman, 557 F.3d at 641

(finding that the lack of bruise or injury "tends to confirm that [defendant] did not use more force

than reasonably appeared necessary to secure [plaintiff's] compliance" (internal quotation marks

and citation omitted)).  In light of the facts and circumstances of the arrest, the Court concludes

that Defendants' use of force was not unreasonable.

> C.      Common-Law Claims[5]

"Under District of Columbia law, the existence of probable cause is an affirmative

defense that can be raised in response to an accusation of false arrest."  Smith, 121 F. Supp. 3d at

119–20 (citing Scales v. D.C., 973 A.2d 722, 729 (D.C. 2009)); see also Scott v. D.C., 101 F.3d

748, 753–54 (D.C. Cir. 1996) ("The elements of a constitutional claim for false arrest are

substantially identical to the elements of a common-law false arrest claim.").  As the Court

previously explained, the video, which provides an objective record of Campbell's seizure,

---

[5] Because the Court exercises supplemental jurisdiction over Campbell's common law
claims, it will apply District of Columbia's choice of law rules to determine which law governs
Campbell's intentional tort claims.  "In this case, the District of Columbia is where the alleged
injury occurred, where the alleged injurious conduct occurred, and where the parties' relationship
was centered. Thus, the substantial-interest test requires the application of [District of Columbia]
law to the common law claims."  Reed v. D.C., 474 F. Supp. 2d 163, 166–67 (D.D.C. 2007).

shows that probable cause supported his arrest.  See supra Section III.A.2.  When Campbell

pulled away and pushed Officer Newton's hands away from him while Officer Newton was

attempting to conduct a stop, his physical resistance created probable cause for charging him

with assault on a police officer, which includes "interfer[ing] with a law enforcement officer . . .

while that officer in engaged in the performance of his official duties."  D.C. Code § 22-405(b).

Because "there was sufficient information to support a reasonable belief that [Campbell]

committed the crime[] of assault on a police officer . . . then there was probable cause to arrest

him, and any claims arising out of his allegedly false arrest must be dismissed."  Smith, 121 F.

Supp. 3d at 119–20.

Campbell's other common-law claims likewise fail because probable cause supported his

arrest.  See Smith, 843 F.3d at 513 ("The existence of probable cause foreclosed not only

[plaintiff's] false arrest, malicious prosecution and Fourth Amendment claims, but also his claim

of intentional infliction of emotional distress based on his arrest.") (citing Amobi v. D.C. Dep't

of Corr., 755 F.3d 980, 989–90, 992–93 (D.C. Cir. 2014) and Kotsch v. D.C., 924 A.2d 1040,

1046 (D.C. 2007)); see also DeWitt v. D.C., 43 A.3d 291, 295–96 (D.C. 2012) ("The existence

of probable cause will likewise defeat a claim for malicious prosecution[.]" (internal citations

omitted)).  Moreover, for his IIED claim, Campbell must establish "(1) extreme and outrageous

conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff

severe emotional distress."  Minch v. D.C., 952 A.2d 929, 940 (D.C. 2008) (quoting D.C. v.

Thompson, 570 A.2d 277, 289–90 (D.C. 1990)).  Here, the officers' use of reasonable force in

effectuating an arrest does not constitute extreme and outrageous conduct and the distress

suffered from a lawful arrest does not entitle Campbell to recovery.  See Smith, 843 F.3d at 513;

see also Kotsch, 924 A.2d at 1046, 1050 n.5 (holding that a lawful arrest itself cannot form the

16

basis for a claim of extreme or outrageous conduct and the extreme and outrageous standard is even more exacting than the "reasonableness" standard used for analyzing § 1983 excessive force claims).

Similarly, because Campbell's arrest was lawful and the officers' use of force was reasonable, see supra Section III.A.2, summary judgment is also warranted in favor of Defendants on the assault and battery claims.  Officer Newton was "privileged to use force so long as the means employed [were] not in excess of those which [he] reasonably believe[d] [were] necessary."  Etheredge v. D.C., 635 A.2d 908, 916 (D.C. 1993); see also Dormu, 795 F. Supp. 2d at 27–28 ("[U]nless the threatened use of force is clearly excessive, an officer is protected against liability for assault." (quoting Jackson v. D.C., 412 A.2d 948, 956 (D.C. 1980))); Magliore v. Brooks, 844 F. Supp. 2d 38, 44 (D.D.C. 2012) (granting summary judgment on a battery claim because "[i]f the officer does not use force beyond that which the officer reasonably believes is necessary, given the conditions apparent to the officer at the time of the arrest, he is clothed with privilege." (internal citation omitted)).

## IV.   Conclusion

For the reasons set forth above, the Court will grant in part and deny in part Defendants' motion for summary judgment.  A separate Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  March 29, 2017